Filed 5/25/16  Bolen v. Van Wormer CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| AMANDA C. BOLEN, | |
| Plaintiff and Appellant, | G051545 |
| v. | (Super. Ct. No. 04P000144) |
| JOSEPH WILLIAM VAN WORMER, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from an order of the Superior Court of Orange County, Linda Lancet Miller, Judge.  Affirmed in part and reversed in part.

Law Offices of Jim P. Mahacek and Jim P. Mahacek for Plaintiff and Appellant.

Law Offices of Dorie A. Rogers, Dorie A. Rogers, Lisa R. McCall; Jarvis, Krieger & Sullivan and Wendy Fountain for Defendant and Respondent.

\*          \*          \*

Amanda C. Bolen (Amanda) is the mother of Mason, who was born in October 2003. Joseph William Van Wormer (Joseph) is Mason's father. Amanda and Joseph have never been married. Under a stipulated judgment, Amanda was given sole physical custody, and Amanda and Joseph were given joint legal custody, of Mason. Amanda appeals from the trial court's order denying her request to move with Mason to Michigan, where her parents reside. The trial court found that if Amanda moved to Michigan, it would be in Mason's best interest to stay in California with Joseph and to give Joseph primary physical custody. When Amanda announced she would not move to Michigan in light of the court's decision, the trial court ruled on Joseph's request for more parenting time and awarded Amanda and Joseph joint physical custody of Mason.

A parent with sole physical custody, such as Amanda, has the presumptive right to relocate with the minor child. (Fam. Code, § 7501, subd. (a).) The noncustodial parent, such as Joseph, may rebut that presumption by showing the proposed relocation would cause detriment to the minor child. (*In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 957 (*Brown & Yana*).) The central issue in this case is whether the trial court erred by determining, at the outset of trial, that Joseph had met his threshold burden of showing that Mason would suffer detriment from the proposed move and by placing the burden on Amanda to show the move would be in Mason's best interest.

We conclude the trial court did not err and affirm the order denying Amanda's move-away request. To reach that conclusion, we resolve several subissues, as follows: (1) moving a minor child a substantial distance from the noncustodial parent's residence, coupled with a showing of detriment to the minor child from the move, constitutes changed circumstances justifying a change in custody; (2) the trial court did, in fact, find that Joseph had met his burden of showing prejudice and did shift the burden to Amanda; (3) the court's finding that Joseph had shown detriment on a child was properly based on a custody investigation report, Amanda's move-away request, and

Joseph's responding declaration, and the court did not err by making that finding before taking evidence at trial; (4) to rebut Amanda's presumptive right to relocate with Mason, Joseph was required only to make a prima facie showing of detriment; and (5) Joseph met his burden of showing detriment.

Because Joseph made the initial showing of detriment, he established a change in circumstances rebutting Amanda's presumptive right to move with Mason. As a consequence, the trial court could reconsider the existing custody order in light of the evidence presented at trial.

Amanda does not challenge the decision to give Joseph more parenting time; she argues, however, the trial court erred by modifying the physical custody order by awarding Joseph and her joint physical custody of Mason. She is correct on that point. Joseph requested sole physical custody of Mason in the event Amanda moved. Joseph did not request joint physical custody of Mason in the event she did not move. We therefore reverse that part of the order granting Amanda and Joseph joint physical custody of Mason and in all other respects affirm.

## BACKGROUND

Mason was born in October 2003. Amanda and Joseph were never married to each other; Mason was conceived during a brief relationship. Amanda and Joseph met at a treatment facility while each was residing in a sober living home.

In January 2006, Amanda and Joseph agreed to a stipulated judgment establishing parental relationship (the Judgment) which awarded Amanda sole physical custody, and awarded Amanda and Joseph joint legal custody, of Mason. The Judgment also included provisions for a parenting plan, visitation, and child support. Joseph had parenting time with Mason on Wednesday evenings for three hours, and from 7:00 p.m. on Friday to 7:00 p.m. on Sunday every other week. Holidays were divided between Amanda and Joseph.

3

In April 2014, Amanda filed a request for an order allowing her to move with Mason to Rockford, Michigan.  Amanda sought to move to Michigan to be closer to her parents, to rejoin her extended family, and to take advantage of an offer of employment.  She declared she intended the move in good faith and not to frustrate Joseph's contact with Mason.

Joseph filed a responsive declaration objecting to Amanda's request for a move-away order.  Joseph declared that if Mason were allowed to move with Amanda, "our relationship with him will be severely impacted, I will not be able to participate in his day-to-day life, and will not be able to support him in school, or his extracurricular activities."  Joseph also filed a request for an order awarding him sole physical custody of Mason in the event Amanda moved to Michigan.

The trial court ordered a full child custody investigation.  The confidential report of that investigation (the CCI Report) was submitted in August 2014.  The CCI Report recommended granting Amanda's move-away request.

## TRIAL PROCEEDINGS AND EVIDENCE

### I.

### Finding of Detriment and Determination of Burden of Proof

Trial took place over five days in September 2014.  At the outset, the court stated that, after reading the CCI Report and the "moving and responding papers," it had determined Mason would suffer detriment if Amanda were permitted to move with him to Michigan.  "[T]herefore," the court stated, "the burden is on [Amanda] to show the move is in the best interests of [Mason]."  The trial continued that day and over four more days.  Amanda presented her case first.  Testimony was received from Amanda, Joseph, Amanda's mother, Dawn Bolen (Mrs. Bolen), Amanda's father, Jeffrey Bolen

4

(Mr. Bolen), Joseph's father, Jay Van Wormer (Mr. Van Wormer), and Joseph's girlfriend, Sandy Lingen Felter.

## II.

## Evidence at Trial

A. *Amanda*

Amanda testified as follows.

Mason is the only child of Amanda and Joseph, who have never been married to each other. Amanda has complied with the Judgment since its entry and has always provided Joseph the visitation to which he was entitled. She has had no significant parenting arguments with Joseph, and nothing has changed over the years regarding her ability to raise Mason.

Amanda wants to move to Michigan for both economic and emotional reasons. Economically, it would be less expensive to raise children in Michigan than in California. Emotionally, Amanda would have in Michigan the support of an extended family of about 62 people, about half of whom were children, within a 15-mile radius. Amanda's parents, who have a substantial role in Mason's life, have moved to Michigan, and Amanda's brother and sister are planning to move there. In Michigan, Mason would attend school with four of his cousins. Amanda has received an offer of employment in Michigan through a family member.

Amanda's father, Mr. Bolen, has made the downpayment on a home for Amanda in Michigan. The home has a backyard, would provide more living space than Amanda's current residence in California, and would allow Mason to have his own bedroom. If Amanda did not move to Michigan, she would not be able to afford to stay in the same house in California.

Amanda worked for Mr. Bolen's company but lost her job after the company was sold. She has begun attending court reporter school, was one year into a two-year program, and could finish school in Michigan.

5

Amanda's parents have played a substantial role in Mason's life. They were at the hospital when Mason was born, and Amanda went directly to her parents' home from the hospital. Amanda and Mason lived with her parents for about three years. Amanda's parents are part of her support network and helped her care for Mason. Mason takes vacation with Amanda's parents two or three times per year. Amanda's parents helped pay for pregnancy and childbirth expenses and have provided her financial support.

At the time of trial, Mason was in fifth grade. Mason, who started playing sports at age five, plays football, baseball, and lacrosse, and has just started karate. Mr. Bolen pays the registration fees for Mason's sports teams. In Michigan, Mason would be able to participate in those activities with his cousins. Amanda is the "team mom" for baseball and volunteers some of the time for football. When Mason is in her custody, Amanda takes him to football practices and games. Joseph did not attend Mason's games until about a year ago, when he started regularly attending football games.

In 2009, when Mason was six years old, Amanda married Mr. Dash and had two children by him. Those two children were, respectively, four yours of age and 23 months of age at the time of trial. Mason has a good relationship with his half siblings, and Amanda believes he would suffer if separated from them. Although Amanda's marriage to Dash started out happy, in the previous year, there had been an incident regarding Dash's drug abuse in which he accosted Amanda in front of her three children and stabbed her in the shoulder with a ballpoint pen. Amanda immediately reported the incident to the police. Dash was removed from the house and Amanda filed for divorce less than three weeks later. Mason attended therapy to address the experience. Amanda never saw Dash strike or otherwise abuse Mason.

Dash stopped providing for Amanda and her children after she filed for divorce. He was incarcerated for a while, and Amanda obtained a temporary restraining

6

order against him. He violated the restraining order and was jailed as a result. He has been released from jail, and Amanda is afraid he will continue to violate the restraining order. Amanda wants to move to Michigan in part to get away from Dash.

Amanda encourages Mason to use his cell phone to call Joseph and does not monitor the calls. Mason also uses the cell phone to talk to friends. If Amanda moved with Mason to Michigan, she would not stop him from calling his friends in California. Mason changes sports teams every year and, as a consequence, is constantly changing his groups of friends. Mason is "bubbly and outgoing" and makes friends easily. Amanda had visited the neighborhood in Michigan in which she would be living and had no concerns about Mason's ability to make new friends there.

Mason attended Catholic school for the first through third grades then, for financial reasons, was placed in public school. Amanda did not consult Joseph before enrolling Mason in public school, did not provide Joseph with the registration forms, and did not give the school Joseph's e-mail address. The transition did not affect Mason's grades and Mason had no difficulty making friends at the new school. Amanda believes Mason would have no difficulty making a smooth transition from Southern California to Michigan.

Amanda attends school full time and has a part-time nanny. Mr. Bolen pays the cost of the nanny, loans Amanda $2,150 per month to pay for rent, pays for her car, and pays her legal fees. If she moves to Michigan, she would not need a nanny because her extended family would fill that role. When Amanda returns home from school, she cooks dinner, bathes her children, and helps with homework. Amanda has a daily routine with Mason and tries to instill values in him through schoolwork, chores, and team sports.

Until three years ago, Joseph had never asked for vacation time with Mason. Amanda always granted Joseph's request for vacation time. Mason has enjoyed vacation time with Amanda's parents. She has allowed Mason to go to Big Bear with

7

Joseph's parents if the trip was over a weekend on which Joseph had parenting time, and has allowed Mason to spend additional time with Joseph's mother. Amanda had never tried to limit Mason's contact with Joseph, never tried to alienate Mason from Joseph, and never said negative things about Joseph to Mason. Amanda values Mason's relationship with Joseph and encourages that relationship. Amanda's intent in moving to Michigan is not to minimize Mason's relationship with Joseph. After moving to Michigan, Amanda would continue to encourage Mason to contact Joseph by telephone, e-mail, Skype, and FaceTime, and would honor Joseph's visitation rights.

Mr. Bolen, not Amanda, first informed Joseph of the planned move to Michigan. Amanda also discussed the move to Michigan with Joseph but "[i]t wasn't very well received." She participated in voluntary mediation about the proposed move and had been open and honest about it with Joseph.

Joseph takes Mason to church, and Amanda supports his instilling Christian values in Mason. Although Mason was baptized a Roman Catholic and has followed Catholic tenets, Amanda has no objection to Mason attending a non-Catholic Christian church with Joseph.

Amanda believes moving to Michigan would be in Mason's best interest. She would not do anything to intentionally hurt him. She had been considering moving to Michigan since the time she was married to Dash and was not planning to move in order for Mr. Bolen to continue to support her.

Amanda consulted Joseph before registering Mason for baseball and lacrosse. When she registered Mason for football, she provided Joseph's name, telephone number, and e-mail address. She did not give Joseph the contact information for the football coach because she was not given authorization to do so.

Amanda provided information to Joseph regarding Mason's school and they jointly attended parent-teacher conferences until Mason was in fourth grade, when

8

Joseph held his own separate conference. She also has kept Joseph informed regarding back-to-school nights and open houses.

Joseph asked Amanda for midweek overnight visits with Mason. Amanda allowed midweek visits on three or four occasions but did not allow them to continue because Mason was late to school and would forget his homework. The homework file did not go with Mason to Joseph's house but stayed at Amanda's house. Mason has expressed an interest in spending more time with Joseph. Amanda now does not permit Mason to have midweek visits with Joseph or for Mason to spend Sunday night at Joseph's home.

Flight time from Southern California to Grand Rapids, Michigan, is about six hours. Amanda and Mason have talked at length about travelling and both have agreed, "it would be okay."

Amanda sees Mr. Bolen as playing an active part of Mason's life, meaning "he is a supporter in his extracurricular activities, he is a male role model for him to talk to other than his father, if he so chooses." She sees Joseph as having "[t]he same" role.

B. *Joseph*

Joseph testified as follows.

Joseph believes it would be in Mason's best interest to have "steady, consistent, access to both parents," which Mason would not have if Amanda were allowed to move with him to Michigan. Joseph believes that moving to Michigan, where Amanda would be supported financially by her parents, was "the easy way out" for her to avoid becoming self-sufficient and learning to support her family. Joseph would like to have been consulted before Mr. Bolen provided more financial support for Mason.

Joseph agreed to the parenting time set forth in the Judgment. Amanda had never denied him his right to parenting time. He does not use all of his allotted vacation time with Mason. Joseph has never had difficulty discussing minor modifications to the parenting schedule. When Amanda was married to Dash, Joseph met with them several

9

times to request more time with Mason. Joseph expressed concern that, while Amanda was married to Dash, Mason would "act[] out." When with Joseph, Mason did not "act out" and his "emotional well-being" was much different.

Dash had used a paddle to inflict corporal punishment. Joseph did not learn about the paddle until Mason mentioned that Mr. Bolen had taken it away. Joseph told Mason that no one was to hit him with anything. Joseph met with Amanda and Dash, who admitted having a paddle.

Amanda failed to inform Joseph that she was the victim of abuse by Dash and that Mason was in an abusive home. Joseph is glad that Dash was "no longer in her life" but is not "one hundred percent" sure of Amanda's parenting ability. Joseph believes Amanda acted responsibly by reporting Dash to the police and obtaining a restraining order against him.

Joseph had read the CCI Report and does not agree with its recommendation that the court grant Amanda's move-away request. Joseph believes the evaluator "did a bad job at highlighting my relationship and the importance of my relationship with Mason." The evaluator did not consider that "if [Mason] were to move, Amanda being his mother could not teach him to be a man. That was my job. [¶] It is not the job of . . . [t]he grandfather. It is my job." Joseph believes: "[T]he evaluation did a poor job at uncovering the impact it's already had on Mason and the impact it will have on Mason. . . . [¶] And the difficulties in the travelling, and the problems that could arise in that impact, that it's going to have [on] him."

In support of his request for custody, Joseph testified: "If Amanda were to move, Mason's environment would change. It would disrupt the environment. [¶] If he comes with me, he would have a lot better, well adjusted to come live with me. [¶] He would stay in the same school, be able to hang out with the same people, play on the same sports teams. [¶] . . . [¶] I could provide him a little more stable environment. [¶] We attend church regularly. He participates in church, just as I do. We participate

10

together." Joseph believes he is teaching Mason a better value system than the system taught him by Amanda and her family. In particular, Joseph believes Amanda's family tries to buy Mason's approval, and "[t]hat's not how I want to raise my son."

Joseph believes if Mason were to move to Michigan, he "would lose the intimacy" he has with Mason and would "lose the ability to create the value system" he has with him. Joseph acknowledged that, if he obtained custody of Mason, his relationship with Amanda and her other children would be disrupted.

Joseph lives with his parents in a four-bedroom, two-bathroom, attached home with a yard. Mason has his own bedroom and shares a bathroom with Joseph.

On Wednesday evenings, Joseph picks up Mason at 5:30 p.m., and, if he is playing football, takes him to practice. Joseph watches the practice "for some of the time." After practice, Joseph spends an hour and 15 minutes with Mason before returning him to Amanda at 8:30 p.m. Joseph has Mason every other weekend from Friday at about 5:30 p.m. to Sunday at 7:00 p.m. Joseph attends an Alcoholics Anonymous meeting on Friday night while Mason attends a children's program. On Saturday morning, Joseph and Mason go to one of Mason's sporting events. Later in the day, they might go to the beach, a barbecue, or the movies. On Sunday morning, Joseph and Mason attend church (if they did not attend on Saturday night), and afterwards do chores and cook dinner. Joseph has taken Mason to soccer, baseball, and football games, and to Disneyland. On weekends in which Joseph does not have Mason, Joseph attends his sports activities.

About three years earlier, Joseph met with Amanda and Dash to discuss extending Joseph's Wednesday visit with Mason to an overnight. Joseph did receive a couple of overnight visits. On one such visit, Joseph was late getting Mason to school because it was Joseph's first time taking Mason to school and Joseph did not know the routine. Additional overnight visits were stopped. Joseph was told they were "too much of a change," leading him to believe he had done something wrong.

11

During the prior year, Joseph contacted Mason's school and learned that Mason was struggling. Amanda had not told him. Joseph asked for a followup parent-teacher conference, which Amanda did not attend. A conflict arose between Joseph and Amanda over Mason's attendance at the year-end school open house. Amanda told Joseph that Mason was not to attend; Joseph contacted Mason's teacher, who said Mason should be there. Amanda said she was not going to go to the open house, but when Joseph and Mason arrived, she was there, and "it was a little tense[]."

Communication from Amanda to Joseph about Mason's school activities "hasn't been at the strongest point." Joseph feels as though he received no support from Amanda to address Mason's behavior issues at school. The last time Amanda had informed Joseph of Mason's behavior issues was when Mason was in preschool or kindergarten. Joseph participated in Mason's most recent back-to-school night and signed up for a parent-teacher conference.

Amanda did not consult Joseph before making educational decisions for Mason. When Mason was switched to public school, Amanda after the fact informed Joseph that Mason had been enrolled in a particular school. Although Joseph did not object to the school, he would have liked to have been consulted beforehand. Amanda notified Joseph the day before the enrollment deadline that Mason should play football, the cost was $400, and Mr. Bolen would not pay for it. Joseph was leaving the next day to go on vacation, he and Amanda had never discussed football, and he had not budgeted the money for it. Joseph agreed to pay half the cost. Amanda did not give Joseph contact information for football and did not tell him about the league and the games.

Joseph recently asked Amanda several times about having extra time with Mason. She said no, but did agree once to allow Mason to spend a night with Joseph at his parents' home in Big Bear. Mason could not spend an extra night because Amanda had scheduled a pitching lesson for him in the early afternoon. Joseph found that he was often denied extra time with Mason because Amanda had scheduled a conflicting

12

sporting activity.  Joseph often is asked by Amanda to shift parenting times. Joseph has always agreed to allow Mason to travel to see Amanda's parents.

If Mason were to stay in California, Joseph would have him continue at the same school (as long as he was in the same school district), keep him in the same sports, and maintain relationships with his friends.

Earlier that year, Joseph and his girlfriend took Mason and his friends, Abby and Josh, on a camping trip.  The three children slept in a tent of their own, while Joseph and his girlfriend slept in a separate tent next to them.  Other campers were at the site.  When Mr. Bolen learned of the sleeping arrangements, he sent Joseph a strongly worded text message criticizing Joseph's judgment.  The message read:  "Joe, I spoke to Mason to find out how your vacation, bonding, camping trip went.  he then told me the # of people but then told me the sleeping arrangements !!  Before you wonder who this nosey bastard is, Please let me make one thing Unequivocally clear, I was, I am, and I will be the one constant, consistent male in Mason's life.  Not non existent for years, then try to be Dad of the year for the past six months!!  Now about the sleeping arrangements and the terrible decision you made to allow three kids (1 girl & 1 13 yr old) to sleep together, unsupervised [i]n a tent for several nites!!  Couple this with you sleeping with your girlfriend who is older than your mom in another tent.  What are you burning for brains???  Joe you make decisions like these at the same time you claim to have 'a better value system', attend church, etc, etc,.  you're a hypocrite who is thinking with the wrong head  Along these same lines, what type of a[n] example are you to [M]ason??  You have Sandy overnite [*sic*] on weekends you have Mason.  In closing, when my grandkids are involved, and I am aware of a[n] indiscretion caused by either my own kids or . . . you, I would not stand for much if I allowed things to happen that are either unsafe, immoral, hurtful, etc.  Without taking immediate appropriate action.  I would strongly suggest you immediately start to put Mason's long-term best interests first and foremost!!  For those

of you new to this it is called being a 'Dad'.  Questions ?  Call me if any clarification is needed."  (Italics omitted.)

Joseph was caught off guard by the text message and found it to be "a little hurtful."  He was not surprised by the message because he "had a history" with Mr. Bolen.  Joseph believes Mr. Bolen does not respect him or care for his relationship with Mason.  Mr. Bolen had been aggressive and violent in the past and was "typically negative of some of the things that I am doing."  Joseph testified:  "Mr. Bolen has—in my opinion, has always viewed me as someone that he wishes will go away."  In the hospital, when Mason was born, Mr. Bolen asked Joseph to sign a document waiving paternity rights.  Joseph did not sign it.

Mr. Bolen was the first to approach Joseph about the move to Michigan.  Mr. Bolen called Joseph and requested having a family meeting, and a separate meeting with Amanda, to talk about the proposed move.  Joseph got the impression that Amanda did not yet know about the move.

Amanda did not inform Joseph when Mason misbehaved.  On one occasion, she had Mason's football coaches talk to Mason about his behavior.  Amanda did not tell Joseph or consult him.  Joseph believes if Amanda were to move to Michigan with Mason, she would not consult Joseph about Mason's medical treatment, extracurricular activities, or behavior issues.  Instead, she will consult Mr. Bolen.

At church, Mason participates in the children's ministry, has worked on outreach projects, and has actively supported mission trips to Uganda.  These activities are beneficial for Mason because they help to instill higher values and teach him to be "selfless."

Joseph's grandparents live in Michigan.  Mason last saw them three years earlier when they travelled to California.  Joseph has several other relatives living in Orange County.

Joseph believes Amanda does not support his relationship with Mason. She schedules activities during his time with Joseph and will not extend visitation time. Joseph described his relationship with Mason as "better than it ever has been. [¶] . . . [W]e continue to build into it and grow. He's a young adolescent, becoming a teenager. [¶] It's an important time. The older he gets, the more we can relate." Joseph believed his relationship with Mason would have to change "[s]lightly" if he were to move to Michigan.

Joseph believes it is important to have both parents consistently involved in Mason's life and that his involvement in Mason's life increase. "[I]t's very difficult to co-parent when one is in Michigan and one is here in California."

## C. *Mrs. Bolen (Amanda's Mother)*

Mrs. Bolen testified as follows.

Mrs. Bolen met Joseph at a Starbucks café to discuss the proposed move. Joseph told her his object was to prevent Amanda from moving with Mason to Michigan.

The relationship between Mrs. Bolen and Mason was "very close." After giving birth, Amanda and Mason moved into her parents' home and lived there for three years. Amanda's parents see Mason a couple of times per week, attend his sports activities, and take him on vacation. Mason appeared to enjoy the time he spent in Michigan with Amanda's parents.

Mrs. Bolen confiscated the paddle from Dash and told him, "it was not an appropriate way to correct a child." Mason interacts well with Amanda's two other children and, if separated from them, would miss them.

## D. *Mr. Bolen (Amanda's Father)*

Mr. Bolen testified as follows.

Mr. Bolen's relationship with Mason is "very, very close." They do many things together. He had been involved "on a daily basis" with Mason's development—"from walking to talking, hitting his first ball, catching his first ball, golfing, catching

15

ball, coloring and everything a regular—a normal parent would be involved in."
Mr. Bolen has provided almost "a hundred percent" of Mason's financial support, and
Joseph never objected to him doing so.

Mr. Bolen criticized Joseph's decision regarding the sleeping arrangement
on the camping trip. Mr. Bolen would have had a "guys tent" and a "girls tent[]." He
told Joseph he had made "a bad decision by allowing a teenager boy to stay with a little
bit younger boy and a girl." Mr. Bolen would have been "a little bit more in tune to
what's going on and I just thought it was a bad decision." He also criticized Joseph for
taking his girlfriend on the camping trip.

Mr. Bolen sent the text message to Joseph with the intent of criticizing his
parenting decisions. Mr. Bolen did not send the text message to bully or intimidate
Joseph but to urge him to think about his decisions. Mr. Bolen also was critical of Joseph
for having "his head in the computer" and smoking at Mason's baseball games.
Mr. Bolen could not recall how long ago he saw Joseph smoke and acknowledged that
Joseph had quit smoking.

Mr. Bolen did not order Amanda to move to Michigan and did not threaten
to cut off financial support for her if she did not move. He lives in Michigan, having sold
his house in California the previous March, and has a large extended family in the
Rockford, Michigan, area. He made a downpayment on a house in Rockford for Amanda
with the expectation that she would make the monthly payments. The house has five
bedrooms and is set on two acres. There are 20 to 24 homes on the street and many
children live in the neighborhood.

Mason lived with Mr. Bolen until Mason was between three and four years
old. During the past six months, he has helped Mason with his homework three or four
times and has attended many of Mason's sports activities.

Mr. Bolen telephoned Joseph to discuss the proposed move to Michigan.
Mr. Bolen told Joseph, "you're a big part of this" and suggested a meeting with Joseph

16

and his parents to discuss the pros and cons. Joseph said he would get back within a few days. Mr. Bolen had spoken to Mason about moving to Michigan, took Mason to see the home he had purchased for Amanda, and had Mason select his bedroom. Mr. Bolen had spoken to Mason about putting in a driving range, pitching machine, batting cage, and basketball court on the property in Michigan. Mr. Bolen also had spoken to Mason about where he would be attending school in Michigan.

When asked on cross-examination what role Joseph should have in Mason's life, Mr. Bolen testified, "helping with school, teaching him to be a good young man." The court asked, "[s]imilar to yours?" Mr. Bolen responded: "Yeah. [¶] . . . [H]e is the father and . . . I would imagine that he would do that."

When cross-examined about the text message, Mr. Bolen testified, "I still am the one consistent [male role model]—I'm there. I'm . . . there all the time and I will be . . . that same guy that he could count on, that he's always been able to count on. [¶] Me. And he always counts on me." Mr. Bolen "kn[e]w" that Joseph had not been constant in Mason's life. Mr. Bolen testified that Joseph "skipped out" of visits, could not make it for weekend parenting time, and had taken off on vacations. In a "perfect world," Joseph's relationship with Mason would be more important than Mr. Bolen's relationship with him. In a perfect world, Joseph "would be the man" or "the pregnancy wouldn't have occurred."

When asked whether he or Joseph was more important in Mason's life, Mr. Bolen testified: "I'm there. [¶] I been there. . . . I would say, basically, there's the new improved Joe Van Wormer over the last few months[.] . . . I wished that he would have stepped up years ago . . . but he hasn't. He never did. [¶] And now he is and he's playing like he's a great dad. . . . For the last six months, he's been doing everything. That's good. Wonderful. Great."

Mr. Bolen did not ask Joseph to waive his parental rights to Mason. When Mason was born, Joseph approached Mr. Bolen in the hospital and asked, "what shall I

17

do now?"  Mr. Bolen said he could not answer that question, but Joseph "could walk away from it" or "step up."

E. *Mr. Van Wormer (Joseph's Father)*

Mr. Van Wormer testified as follows.

Mason stays with Mr. Van Wormer when Joseph has parenting time on Wednesday evenings and every other weekend.  Joseph started living with his parents about three years earlier.  Mr. Van Wormer owns a home in Fountain Valley and a home in Big Bear.  Mason had been to the home in Big Bear once and that was over a weekend on which Joseph had parenting time.

Mr. Van Wormer attends Mason's football games and baseball games.  He described his relationship with Mason as "close" and believes Mason felt comfortable spending time and talking with him.  Joseph is a good parent and has never struck or spanked Mason.  Mason respects Joseph.

Mr. Van Wormer has gotten along well with Mr. Bolen except when he announced that Mason would be moving to Michigan.  The announcement came at one of Mason's lacrosse games.  Mr. Bolen mentioned he would be moving his children and Mason to Michigan because it would be cheaper for him to support them there than in California.  Mr. Bolen did not ask for permission but stated, "that was the plan."

Mr. Van Wormer would have no concerns over Joseph's parenting if Joseph had custody of Mason.  Mr. Van Wormer worked from home and would be able to help parent Mason.

F. *Felter (Joseph's girlfriend)*

Felter testified as follows.

Felter has known Joseph for about six years and has been dating him for a little over two years.  She has observed Joseph and Mason together.  Mason has no anxieties around Joseph and enjoys spending time with him.  She sees Mason when Joseph has parenting time and attends many of Mason's football games.  Joseph does not

use his computer or smoke at Mason's games. Joseph and Mason engage in various activities together, including cooking, rollerblading, baseball, soccer, and watching movies. Felter accompanies Joseph and Mason to church services.

Felter has heard Mason ask Joseph if he could stay longer for visits. She has seen Mason ask Amanda for more time with Joseph, but Amanda would not allow it. Mason's relationship with Joseph's parents was "[g]ood."

## III.

## The Trial Court's Findings and Ruling

At the conclusion of trial, the court orally made findings. The court found that "if [Amanda] moves to Michigan, it is in Mason's best interest to remain here with [Joseph] to have primary physical custody." Among other things, the court found that Amanda was not moving to deprive Joseph of parenting time. The court found that Mr. Bolen financially and emotionally controlled Amanda and had advocated the move, and if Amanda were to move with Mason to Michigan, then Joseph's relationship with him would be over ("I think if you move, with Mason, that [Joseph] is gone. He's done."). The move would impair Joseph's ability to instill his values with Mason on a daily basis, and he would be able to have only a limited effect on Mason's life. The court agreed with Joseph that if Mason moved away, Joseph would be losing the intimacy of "little moments" of parenting, such as listening to Mason while driving in the car.

After the court made those findings, Amanda represented she did not intend to move. The trial court then ruled on Joseph's request for increased parenting time. The court modified Joseph's parenting time to Thursday after school to Monday morning, every other week, and Thursday to Friday alternating weeks. Holidays are to be divided between Amanda and Joseph. The court ordered "joint physical custody with unequal parenting time."

In February 2015, the trial court issued a written order and statement of decision reflecting the findings made orally on the record. The court found that Amanda

19

is "a good mom" and Joseph is "a good dad." The court ordered that Joseph is to have physical custody of Mason if Amanda moves to Michigan. Because Amanda had informed the court she intended to stay in California, the court granted Joseph's request for more visitation time, finding it was in Mason's best interest to spend more time with him. The court modified physical custody to give Amanda and Joseph joint physical custody of Mason with unequal parenting time. Amanda timely filed a notice of appeal.

## DISCUSSION

### I.

### Legal Framework and Standard of Review

"Once the trial court has entered a final or permanent custody order reflecting that a particular custodial arrangement is in the best interest of the child, 'the paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker—weigh heavily in favor of maintaining' that custody arrangement. [Citation.]" (*Brown & Yana*, *supra*, 37 Cal.4th at p. 956).) The changed circumstance rule, which is a variation on the best interest standard, applies when a parent seeks modification of a final judicial custody determination. (*Ibid.*) "Under the changed circumstance rule, custody modification is appropriate only if the parent seeking modification demonstrates 'a significant change of circumstances' indicating that a different custody arrangement would be in the child's best interest. [Citation.]" (*Ibid.*)

A parent with sole physical custody "has a right to change the residence of the child, subject to the power of the court to restrain a removal that would prejudice the rights or welfare of the child." (Fam. Code, § 7501, subd. (a).) In a move-away case, a change of custody from the custodial parent to the noncustodial parent is justified only if, as a result of relocation with the custodial parent, the minor child will suffer detriment making a change in custody essential or expedient for the child's welfare. (*In re*

20

*Marriage of Burgess* (1996) 13 Cal.4th 25, 38.) "What this principle means in application is that a custodial parent seeking to move is not obliged to establish a need or even a justification for the move, so long as it will not be detrimental or prejudicial to the child's interests." (*In re Marriage of Melville* (2004) 122 Cal.App.4th 601, 611.)

A custodial parent does not have an absolute right, but only a presumptive right, to move with the minor child. (*Brown & Yana*, *supra*, 37 Cal.4th at p. 957.) To overcome that presumption, the noncustodial parent bears "the initial burden of showing that the proposed relocation of the child's residence will cause detriment to the child, requiring a reevaluation of the existing custody order." (*Id*. at pp. 959-960.) This threshold showing of detriment is made on the parties' allegations, applications, supporting declarations, and any offers of proof. (*Id*. at pp. 962-963.) If the noncustodial parent meets this burden of showing detriment, then an evidentiary hearing may be conducted and the trial court performs "'the delicate and difficult task of determining whether a change in custody is in the best interests' of the child." (*Id.* at pp. 960, 962.)

In deciding whether to modify custody, the court considers various factors, including those identified in *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072, 1101 (*LaMusga*). The factors identified in *LaMusga* are (1) the child's interest in stability and continuity in the custodial arrangement; (2) the distance of the proposed move; (3) the child's age; (4) the child's relationship with both parents; (5) the relationship between the parents including, but not limited to, "their ability to communicate and cooperate effectively and their willingness to put the interests of the children above their individual interests"; (6) the child's wishes if the child is mature enough for such an inquiry to be appropriate; (7) the reasons for the proposed move; and (8) the extent to which the parents currently are sharing custody. (*Ibid.*) Amanda does not argue that the trial court failed to properly consider the *LaMusga* factors or that substantial evidence does not support the court's findings on those factors.

21

"The standard of appellate review of custody and visitation orders is the deferential abuse of discretion test. [Citation.] The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child. [The reviewing court is] required to uphold the ruling if it is correct on any basis, regardless of whether such basis was actually invoked. [Citation.]" (*In re Marriage of Burgess*, *supra*, 13 Cal.4th at p. 32.) "This discretion may be abused by applying improper criteria or by making incorrect legal assumptions." (*Jane J. v. Superior Court* (2015) 237 Cal.App.4th 894, 901.)

## II.

### Relocating a Minor Child Coupled with Detriment to the Child Can Constitute Changed Circumstances.

The Judgment was a final custody order awarding Amanda sole physical custody of Mason. Amanda therefore had the presumptive right to move with Mason to Michigan. (*Brown & Yana*, *supra*, 37 Cal.4th at p. 957.) To overcome that presumption, Joseph, as the noncustodial parent, bore "the initial burden of showing that the proposed relocation of the child's residence will cause detriment to the child, requiring a reevaluation of the existing custody order." (*Id*. at pp. 959-960.)

The central issue in this appeal is whether the trial court placed the initial burden on Amanda to justify the move-away instead of placing the burden on Joseph to show detriment. Before addressing that issue, it is necessary to address the changed circumstance rule and its application to a move-away request. Amanda argues that before the trial court could even consider detriment, Joseph was required to present evidence of changed circumstances, and the proposed move to Michigan cannot in itself be the changed circumstance satisfying his burden.

Amanda is correct that any proposed change in residence in the abstract and in itself does not constitute changed circumstance warranting custody modification. In *LaMusga*, *supra*, 32 Cal.4th at page 1096, the Supreme Court stated: "The mere fact that

22

the custodial parent proposes to change the residence of the child does not automatically constitute 'changed circumstances' that require a reevaluation of an existing custody order. A proposed change in the residence of a child can run the gamut from a move across the street to a relocation to another continent. As we have noted, the noncustodial parent has the burden of showing that the planned move will cause detriment to the child in order for the court to reevaluate an existing custody order." The *LaMusga* court then stated a proposed change in residence might constitute the requisite changed circumstances depending on the consequences of the change: "The likely consequences of a proposed change in the residence of a child, when considered in the light of all the relevant factors, may constitute a change of circumstances that warrants a change in custody, and the detriment to the child's relationship with the noncustodial parent that will be caused by the proposed move, when considered in light of all the relevant factors, may warrant denying a request to change the child's residence or changing custody. The extent to which a proposed move will detrimentally impact a child varies greatly depending upon the circumstances." (*Id.* at p. 1097.)

Changed circumstances and detriment from the proposed move are thus part and parcel of the same question. A proposed change in residence of the minor child constitutes a change in circumstances warranting a custody modification if the change, when considered in light of the relevant factors, might detrimentally affect the minor child. Put another way: change in residence + detriment to the minor child = changed circumstances.

Here, there is no question the proposed move to Michigan would place Mason at a substantial distance from Joseph's residence in Orange County: The proposed move was not just across the street, but across over half a continent (*LaMusga*, *supra*, 32 Cal.4th at p. 1097). For Joseph to establish changed circumstances, and to rebut Amanda's presumptive right to move with Mason, Joseph had the initial burden of showing the move would be detrimental to Mason. Once Joseph made that initial

23

showing of detriment, he had established a change in circumstances rebutting Amanda's presumptive right to move with Mason and requiring the trial court to reconsider the existing custody order. (*Id.* at p. 1096.) Joseph was not required to present evidence of some *other* changed circumstance.

## III.

### The Trial Court Did Find That Joseph Had Shown Detriment and Shifted the Burden of Proof to Amanda.

The parties disagree whether the trial court shifted the burden of proof to Amanda. At the outset of trial, the court stated: "After reading the CCI [Report], and reading the moving and responding papers, [Joseph] has shown detriment by virtue of the move. [¶] And, therefore, the burden is on [Amanda] to show the move is in the best interests of the minor child. Not the best interests of [Amanda]. That's not my issue. It's the best interests of the minor child."

Joseph characterizes the trial court's statements as offhand comments made only to remind the parties that the relevant concern was the best interests of Mason, not the best interests of Amanda. The trial court's language does not lend itself to that characterization. The trial court unambiguously stated that Joseph had met his initial burden of showing detriment and the burden was on Amanda. Most tellingly, the court had Amanda present her evidence first, before Joseph, an act consistent with shifting the burden of proof to her.

## IV.

### The Trial Court Properly Considered the CCI Report, Amanda's Move-away Request, and Joseph's Responsive Declaration in Finding Detriment.

Did the trial court err by shifting the burden to Amanda, or, put another way, did Joseph meet his burden of showing detriment? The trial court based its determination of detriment on the CCI Report, Amanda's move-away request, and

Joseph's responding declaration. Amanda argues the trial court erred by considering those materials. The CCI Report, Amanda argues, was inadmissible, while her move-away request and Joseph's responding declaration were never received in evidence.

A. *The CCI Report*

A report prepared by a child custody evaluator may be received in evidence "on stipulation of all interested parties" and upon receipt "is competent evidence as to all matters contained in the report." (Fam. Code, § 3111, subd. (c).) In this case, there is no stipulation allowing the CCI Report to be received in evidence. The attachment to the order appointing the evaluator includes this advisement: "The report prepared by the investigator as a result of the investigation will be received into evidence by the Court in any hearing in this case, subject to cross-examination." The attachment to the order is not, however, a stipulation by all interested parties.

Both Amanda and Joseph take the position that the trial court received the CCI Report in evidence, and the court minutes for September 9, 2014 reflect the CCI Report was "received in evidence as Court's Exhibit 1." But the reporter's transcript for September 9 reflects only that the CCI Report was identified; no mention is made of the CCI Report being received in evidence.

If the court did receive the CCI Report in evidence, Amanda forfeited any objection by not posing an objection. Amanda argues she never had the chance to object to the CCI Report. We disagree. When the trial court announced it had read the CCI Report, Amanda could have objected to it. She did not do so. When the CCI Report was identified as court exhibit 1, Amanda again could have objected. At no point in the proceedings did Amanda object to the court's consideration of the CCI Report or its receipt in evidence, or move to strike the CCI Report. She therefore forfeited an objection to the court's consideration of the CCI Report. (Evid. Code, § 353, subd. (a); *Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 725-727.)

25

If the trial court erred by considering the CCI Report, the error was harmless. The CCI Report was generally favorable to Amanda and recommended that the trial court grant her move-away request. Joseph felt aggrieved by the CCI Report because he believed it did not give adequate consideration to his relationship with Mason. Moreover, nearly everything in the CCI Report came out in the trial testimony. One thing that did not come out at trial was Mason's statement to the child custody investigator that "if there was one thing he could relay to the Court[,] it is that his parents are really nice."

B. *Moving Papers and Joseph's Responding Declaration*

Amanda contends the trial court erred by considering her moving papers and Joseph's responding declaration because they were not received in evidence. We conclude the trial court did not err by considering those materials.

When presented with a move-away request, the trial court must first decide whether to hold an evidentiary hearing. (*Brown & Yana*, *supra*, 37 Cal.4th at pp. 960, 962.) To make that decision, the trial court must look to the parties' moving and responding papers. An evidentiary hearing in a move-away case is necessary only if one parent has sole physical custody and the noncustodial parent has made the necessary showing of detriment. (*Id.* at p. 962.) As explained in *Brown & Yana*, *supra*, 37 Cal.4th at page 962: "[A]n evidentiary hearing in a move-away situation should be held only if necessary. Where, as here, one parent has been awarded sole legal and sole physical custody of a child, and the noncustodial parent opposes the custodial parent's decision to relocate with the child, a trial court may deny the noncustodial parent's requests to modify custody based on the relocation without holding an evidentiary hearing to take oral evidence if the noncustodial parent's allegation or showing of detriment to the child is insubstantial in light of all the circumstances presented in the case, or is otherwise legally insufficient to warrant relief. [¶] Needless to say, an evidentiary hearing serves no legitimate purpose or function where the noncustodial parent is unable to make a

26

prima facie showing of detriment in the first instance, or has failed to identify a material but contested factual issue that should be resolved through the taking of oral testimony."

The upshot is the noncustodial parent's showing of detriment need not, and cannot, be made during the evidentiary hearing itself—the showing of detriment must be made in the moving and responding papers and supporting documents. In *Brown & Yana*, *supra*, 37 Cal.4th at page 963, the Supreme Court concluded the trial court did not err by denying an evidentiary hearing on a move-away request because the noncustodial parent's order to show cause and supporting papers did not identify any detriment to the minor child that might result from the proposed move.[1]

## V.

### Joseph Was Required to Make a Prima Facie Showing of Detriment to Rebut Amanda's Presumptive Right to Move with Mason.

Having concluded the trial court properly considered the CCI Report, the moving and responding papers, and the supporting documents, we address whether they supported the trial court's decision to shift the burden of proof to Amanda. An issue is the nature of the burden of proof or production necessary to rebut the presumptive right to move. Joseph argues it is a prima facie showing. Amanda argues the term "prima facie" is not found in statute or case law.

Joseph is correct. The noncustodial parent opposing a move-away request has the burden "to make a *prima facie* showing of detriment in the first instance."

---

[1] Family Code section 217, which was enacted after *Brown & Yana*, requires that, on an order to show cause or noticed motion, the family court "shall receive any live, competent testimony that is relevant and within the scope of the hearing." (Fam. Code, § 217, subd. (a).) In an appropriate case, the court may make a finding of good cause to refuse live testimony. (*Id.*, § 217, subd. (b).) Family Code section 217 does not alter the conclusion that a noncustodial parent's showing of detriment may, or must, be made in the moving or responding papers and supporting declarations. If the noncustodial parent fails to make the showing of detriment, then live, competent testimony would not be relevant and within the scope of the hearing.

(*Brown & Yana*, *supra*, 37 Cal.4th at p. 962, italics added.) "The establishment of a prima facie case means the presentation of such proof as will support a ruling or order in favor of the moving party if no controverting evidence is presented." (*People v. Bell* (1989) 49 Cal.3d 502, 554 (conc. opn. of Kaufman, J.).)

## VI.

### Joseph Made a Prima Facie Showing of Detriment Sufficient to Rebut Amanda's Presumptive Right to Move with Mason.

In response to Amanda's move-away request, Joseph filed a declaration setting forth reasons why the move would be detrimental to Mason. Amanda filed objections to the declaration. The trial court did not rule on the objections, so they are deemed overruled. (Cal. Rules of Court, rule 5.111(c)(2).)

Amanda argues the objections should have been sustained and, in her opening brief, repeats them verbatim. The objections are, for the most part, rote or fatuous. For example, to Joseph's statement that "Mason is not in a poor economic situation, and would not be if he stayed," Amanda poses the objections, "[a]sserts legal conclusion" and "[l]acks foundation." It is not necessary to address all of the objections because passages in Joseph's declaration to which Amanda did not object or to which she waived her objections were sufficient to make a prima facie showing of detriment.

In paragraph 5 of his declaration, Joseph stated: "If Mason is allowed to move, our relationship with him will be severely impacted, I will not be able to participate in his day-to-day life, and will not be able to support him in school, or his extracurricular activities. Both parents in Mason's life are invaluable[,] and arbitrarily moving because it's easier financially is not in our son's best interest. Mason's paternal grandparents also live here in Southern California. They have also had a substantial role in his caretaking since birth. My family and I also have numerous relatives and friends in Southern California, with whom Mason has already established a strong community, and

28

in which he participates in extracurricular activities.  As far as I can recall, Mason has only visited [Amanda]'s other relatives a few times for a limited amount of time in the summer.  [Amanda] also fails to mention how extremely important my relationship is with Mason."  (Some capitalization omitted.)  Amanda did not object to this passage.

In paragraph 7 of his declaration, Joseph stated:  "While Mason will be closer to his great-grandparents, who will still be two hours away in Michigan, he has a very limited relationship with them, and because they are elderly, they have a very limited capable impact in Mason's life.  While it would be great for Mason to see them and spend time with them, my relationship and proximity to Mason [are] more important."  (Some capitalization omitted.)  Amanda did not object to this passage.

In paragraph 10 of his declaration, Joseph stated:  "Mason has a large school community that he is involved with; he plays three different sports here; he has his doctors here; and all of his friends are here.  I live here in Southern California, along with his paternal family."  (Some capitalization omitted.)  Amanda did not object to this portion of paragraph 10.

In paragraph 14 of his declaration, Joseph stated: "If Mason moves, it will catastrophically impact our relationship.  Phone calls, video conferencing, and limited summertime visits will not suffice."  (Some capitalization omitted.)  Amanda did not object to this portion of paragraph 14.  In paragraph 15 of his declaration, Joseph stated: "If Mason moves, I will have little ability to parent him, or to be there to aid in his mental and emotional development and growth."  (Some capitalization omitted.)  Amanda did not object to this portion of paragraph 15.

In paragraph 11 of his declaration, Joseph stated:  "In light of the abuse that took place with [Amanda]'s ex-husband, I question her ability to make the right decisions and maintain her parental responsibilities, given she so recently failed at protecting our son from her abusive spouse."  Amanda objected to this passage; however, at trial, her counsel questioned Joseph about it and asked him to explain what he meant.  Joseph

29

testified (with no objection or motion to strike) that Amanda had failed to inform him that she was the victim of abuse by Dash and that Mason was in an abusive home.

Amanda's request for a move-away order also supported a determination of a prima facie case of detriment. The memorandum of points and authorities in support of the request acknowledged, "the geographic distance of the move-away will impact [Mason]'s visitation with [Joseph]" and "the difficulties presented by the long-distance move-away." Those difficulties, Amanda asserted, would be "mitigated by [Mason]'s frequent travel to California to visit [Joseph]."

We conclude Joseph made a prima facie showing that the proposed move to Michigan would be detrimental to Mason. Joseph's declaration showed that Joseph had a good relationship with Mason, the move to Michigan would impair that relationship and Joseph's ability to play a parenting role in Mason's life, Mason's paternal grandparents and other paternal relatives live in Southern California, Mason's friends, school, and church are in Southern California, and Mason participates in three sports in Southern California. Amanda's moving papers showed the proposed new residence in Michigan was a significant distance from Southern California and the proposed visitation schedule would have required Mason to fly back and forth between Michigan and Southern California five times between August 13, 2014 and August 30, 2015.

In addition, the CCI Report confirmed that Mason has a close relationship with Joseph, Amanda and Joseph have not communicated well regarding Mason, Amanda does not consult Joseph before making decisions about Mason, Joseph's parents have a close relationship with Mason, Mr. Bolen tries to control the relationship between Mason and Joseph, and, in the event of a move, Mr. Bolen should be less involved in decision making for Mason and should allow Joseph and Amanda to make decisions for him. The CCI Report quotes the text message from Mr. Bolen to Joseph.

30

# VII.

## The Trial Court Erred by Awarding Amanda and Joseph Joint Physical Custody of Mason.

At the end of trial, after Amanda announced she would not be moving to Michigan, the trial court addressed Joseph's request for more parenting time. The court awarded Joseph more time and, in doing so, also modified custody by awarding Joseph and Amanda joint physical custody of Mason. Amanda argues the trial court erred by modifying the physical custody order.

Parenting time (or visitation time) and *custody* are two distinct matters. A showing of changed circumstances is not required before a court can modify parenting time; a showing of changed circumstances is required to modify custody. (*In re Marriage of Lucio* (2008) 161 Cal.App.4th 1068, 1076-1077, 1079; *Enrique M. v. Angelina V.* (2004) 121 Cal.App.4th 1371, 1378-1380.)

In his request for order, Joseph asked for a modification of the Judgment to grant him sole physical custody of Mason with approximately equal parenting time *in the event* Amanda were allowed to move with Mason to Michigan. Joseph's request for order did not seek a change in custody in the event Amanda did not move to Michigan. Joseph requested only a modification of the *parenting schedule* if Amanda chose to stay in Southern California. His request for order stated: "In the alternative, if [Amanda] elects to remain in Southern California, then I request that we equally share our time with our son on a 2, 2, 5, 5 schedule, such that [Amanda] would have our son on Mondays and Tuesday; I would have him on Wednesday and Thursdays; and we would alternate the weekends from Friday to Monday." During trial, Joseph's counsel did not argue for a change in custody if Amanda chose to stay in Southern California.

Joseph was required to give proper notice of a request to modify physical custody in the event Amanda chose to stay in Southern California. (Fam. Code, § 215, subd. (a).) Because Joseph had not requested joint physical custody if Amanda chose to

31

stay in Southern California, and did not give notice of any such request, the trial court erred by granting that relief. (See *In re Marriage of Gruen* (2011) 191 Cal.App.4th 627, 640 [modifications to support order exceeded family court's jurisdiction because "they were not based on any pending motion or OSC [(order to show cause)] for modification"]; *In re Marriage of Seagondollar* (2006) 139 Cal.App.4th 1116, 1128-1130 [affirmative relief not requested in response to order to show cause].)

## DISPOSITION

That portion of the order awarding Amanda and Joseph joint physical custody of Mason is reversed. In all other respects, the order is affirmed. Each party to bear his or her own costs on appeal.

FYBEL, J.

WE CONCUR:

MOORE, ACTING P. J.

ARONSON, J.

32